UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM T. LAWRENCE,

        Petitioner,

    v.

BILL LOCKYER, Attorney General
of the State of California,

        Respondent.

_____/

No. C 05-3541 SI (pr)

**ORDER DENYING HABEAS
PETITION**

**INTRODUCTION**

William T. Lawrence filed this pro se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action is now before the court for consideration of the merits of Lawrence's habeas petition. For the reasons discussed below, the court denies the petition.

**BACKGROUND**

A.   The Crimes

The evidence of the several crimes of which Lawrence was convicted was recited in the California Court of Appeal's opinion (hereinafter "Cal Ct. App. Opinion"), Resp. Exh. E:

Count Five: Carly

     On September 24, 2002, nine-year-old Carly went with her parents to Jo-Ann Fabrics in Cupertino. At some point while Carly wandered the store, she looked up and saw appellant. He was the only other person in her aisle. He was scratching at his genitals with both hands as he walked and looked at the Halloween toys. Carly felt scared and uncomfortable.

Subsequently, appellant asked Carly if she liked toys.  Carly answered "yes," and then walked away to return to her mother.  Carly was upset, uncomfortable, and scared when she found her mother.  Carly told her mother that a man had spoken with her and played with his private parts.  Carly's mother, Renee B., testified that Carly, using words and body language, explained that the man was "pulling at" his "private parts" with an up-and-down motion.

Carly pointed out appellant to her mother and said he was the man.  As Carly and Mrs. B. left the store, Mrs. B. complained about appellant to a store employee.

Subsequently, Santa Clara County Deputy Sheriff Liza Aguirre spoke with Carly about what had occurred at the Jo-Ann Fabrics store on September 24.  Essentially, Carly told Aguirre that appellant had been touching and scratching his "crotch area" in the store.  According to Carly, as he did so, he looked at her. [Footnote omitted.]

Counts One and Two: Nia

On October 12, 2002, nine-year-old Nia went to the Jo-Ann Fabrics store in Cupertino with her mother, Belinda S., to look for sewing patterns.  The store was very crowded.  Nia helped her mother by retrieving from cabinets the various patterns that her mother chose out of a sewing book.  As Nia looked for a pattern in one of the aisles, she saw appellant in an aisle across from her.  Appellant looked different from the other people in the store; his hair was so long that it was tucked into the back of his shirt and he was wearing a floppy hat.  Appellant looked at Nia as he held a magazine over his face in one hand and used the other to touch, squeeze, and rub his penis.  Seeing this and having him stare at her made Nia feel uncomfortable.

Later, after multiple trips back and forth to the pattern aisle, as Nia and appellant stood approximately eight and a half feet away from each other, Nia looked at him and saw his penis out of his pants.  She watched him touch it with his hand and show it to her for a very short time.  Nia described it as "skin color," round, and like "a hot dog."  Nia did not think appellant was simply scratching himself because he did it for such a long time.  According to Nia, at some point, appellant said something "about leaving, like am I leaving or something."  During the time he had his penis out, he told her, "'I hope you are not leaving any time soon.'"

Nia testified that she saw appellant rub his "privates" against a store cabinet, but she could not remember whether he did that before or after he removed it from his pants.  After seeing appellant's penis, Nia went to her mother.  Nia felt uncomfortable and scared.  She did not like what appellant had done.  Ms. S. noticed that Nia was upset and had a serious look on her face.  Nia told her mother that she wanted to tell her something.  Then, Nia told her mother that a "man had showed his privates to her."  Ms. S. walked around the store with Nia and had Nia point out the man.  Nia identified appellant without hesitation.  Ms. S. yelled at appellant and called the police.  Officers arrived in about 20 minutes and arrested appellant.

Cal. Ct. App. Opinion, ¶. 3-5.

Barbara Feeney, a cashier at the Jo-Ann Fabrics store, testified that Lawrence began frequenting the store sometime in September 2002, and came almost daily and stayed at the store for most of the day for the month or month and a half preceding his arrest.  She testified he would occasionally buy little things like candy but never purchased fabric or thread.

2

Lawrence was acquitted on counts 3 and 4 of the information. The evidence on those counts was that Carly (the same child as in count five) and her 9-year-old friend Caroline had encountered Lawrence on October 5, 2002 at the same Jo-Ann Fabrics store. They saw Lawrence "squeezing or scratching at and slapping his 'privates' in a 'back and forth' motion." Cal. Ct. App. Opinion, p. 4, n.4.

The prosecution presented evidence of two prior acts of sexual misconduct with minors. The first was an incident on June 17, 1996, when Lawrence met an 11-year-old Danielle's family at a beach parking lot and later "'flashed'" Danielle from about 4-5 feet away when she went back to their car alone. "Specifically, Danielle explained that appellant had his hands in his pocket and she saw his penis come out from the bottom of one of the legs of his shorts when he pulled his jacket back." Id. at 6. Danielle told her mother and her mother filed a police report. Second, Lawrence had encounters in 1996-1997 with 14-year-old Esmeralda, a volunteer at a public library, in which he sat at the same table as Esmeralda and on at least two occasions "wrote notes on the library computer, printed them out, and passed them to Esmeralda by scooting them across the table. The notes read: 'Do you want to have dinner?' and 'You look pretty'; 'do you want to have sex?'" Cal. Ct. App. Opinion, p. 7. Lawrence never passed notes to her when there was an adult at the table and never attempted to talk to her.

Evidence was presented that Lawrence suffered a misdemeanor conviction for annoying or molesting a child in 1996 and a misdemeanor conviction for indecent exposure in 1995. The jury was not informed whether these convictions pertained to the Danielle and Esmeralda incidents.

The prosecution also presented evidence of statements Lawrence had made to police officer Jack McPhillips in 1997, in an effort to show his state of mind. The evidence was that, when questioned about another incident of bothering a girl, Lawrence told officer McPhillips that he was in counseling for sexual problems and that he saw a counselor once a week. He also admitted "that he still felt urges when it came to young children, and that he had to consciously stay away from young kids because of his problem." Cal. Ct. App. Opinion, p. 7. Officer McPhillips understood, from the context, that Lawrence was saying that he had sexual problems

with young children and that was what his urges were about.  During cross-examination, defense counsel was able to establish that Lawrence never actually said what his sexual problems were or what his urges were.

The defense theory was that Lawrence was scratching an itch.  Evidence was presented that Lawrence suffered from genital herpes and that herpes causes itchiness just before an outbreak. When he was arrested and was being booked into the jail, Lawrence told the police he had herpes.  A doctor testified that herpes caused itching and numbness about 24 hours before an outbreak and that most likely Lawrence had a history of recurrent genital herpes.  He also opined that, although he had insufficient information to conclude that Lawrence was suffering from a prodrome (i.e., a feeling of itchiness and numbness 24 hours before the outbreak and appearance of lesions) on the specific days, the conclusion that Lawrence was suffering from an actual herpes outbreak on October 12 was consistent with observations made in the rest of Lawrence's records and medical history. Defense counsel argued that Lawrence was scratching that itch, and not exposing his penis or otherwise engaging in sexual misconduct.

B.    Procedural History

Following a jury trial in Santa Clara County in 2003, Lawrence was convicted of one count of indecent exposure with a prior misdemeanor conviction for the same offense, Cal. Penal Code § 314(1), and two counts of annoying or molesting a child under the age of 18 with a prior misdemeanor conviction for the same offense, Cal. Penal Code § 647.6(c)(1).  He was found not guilty of two other counts of violating § 647.6(c)(1).  On September 24, 2003, Lawrence was sentenced to two years and eight months in state prison.

Lawrence appealed. The California Court of Appeal affirmed the judgment of conviction and the California Supreme Court denied his petition for review. Lawrence filed an unsuccessful petition for writ of habeas corpus in the California Supreme Court.

At the time Lawrence filed this action, he was on parole and therefore met the federal

habeas corpus custody requirement.[1] <u>See</u> <u>Jones v. Cunningham</u>, 371 U.S. 236, 241-43 (1963). The court reviewed the petition, identified six cognizable claims, and ordered respondent to show cause why the writ should not issue. Respondent filed an answer and supporting documents. Lawrence filed a traverse and several miscellaneous documents, including a motion for a ruling. The matter is now ready for consideration of the merits of the petition. The court also will rule on Lawrence's "motion for a ruling."

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. <u>See</u> 28 U.S.C. § 2254(b), (c). Respondent argues that state court remedies were not exhausted as to a due process claim based on Lawrence's allegation that the trial court improperly admitted prejudicial preponderance evidence. The court agrees that state judicial remedies were not exhausted for the due process claim. Claim 2 does not raise "even a colorable federal claim" and therefore may be denied even though it is unexhausted. <u>See</u> <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1336 (2006).

---

[1]Lawrence also was in jail based on new charges of the same kind as the current offenses. <u>See</u> Docket # 10 and # 31. A police report attached to docket # 31 states that Lawrence was arrested in 2005 at Wal-Mart in San Jose after, among other things, an employee reported that he had been observed masturbating while looking at girls.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may nor issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.    Miranda Claim - Admission of Statements Lawrence Made To Police

Lawrence alleges that statements were admitted at trial that were obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The statements at issue came from Santa Cruz police officer Jack McPhillips, who testified that Lawrence told him in 1997 that he

6

had urges toward children and sexual problems.  The statements were offered to prove Lawrence's state of mind when he committed the charged offenses.  In a motion to suppress, the defense argued that Lawrence was in custody when questioned so the statements had to be excluded because <u>Miranda</u> warnings weren't given to Lawrence.  The trial court held a suppression hearing at which McPhillips and Lawrence testified.  The trial court determined that there was no custodial interrogation.  <u>See</u> RT 45-96.

The state court of appeal described the facts relevant to whether Lawrence was in custody when questioned.  <u>See</u> Cal. Ct. App. Opinion, ¶. 9-11.  On February 24, 1997, officer McPhillips was checking into a report that Lawrence had approached a 12 year old girl at an aquarium in a shopping center, brushed against the girl, followed her around and made her feel uncomfortable.  Officer McPhillips learned that Lawrence frequented the aquarium and talked with children, and that the manager had expelled Lawrence after hearing that he had inappropriate contact with a girl.  Officer McPhillips also checked and learned that Lawrence was required to register as a sex offender, was on probation, and had been arrested in the past for child molestation and for indecent exposure.  Officer McPhillips, dressed in plainclothes, went to investigate the aquarium incident and Lawrence in general.  The manager of a coffee shop identified Lawrence to McPhillips and complained that Lawrence had sexual conversations with her and her employees.  McPhillips approached Lawrence, identified himself as a detective, and radioed to dispatch that he would "'be out with a subject.'"  <u>Id.</u> at 10.  McPhillips instructed Lawrence to go outside to talk in private; they left the coffee shop and walked about 100 yards down an alley and breezeway to a private area.  Santa Cruz police officer Howe, dressed in full police uniform, joined them in the breezeway.  Officer McPhillips asked Lawrence open-ended questions about what had happened at the aquarium.  Lawrence "became nervous and fidgety" when McPhillips told Lawrence he knew Lawrence was on probation and had to register.  <u>Id.</u> They spoke for less than 10 minutes, at which time McPhillips told Lawrence he was free to go. Lawrence departed.  Lawrence had not been handcuffed or physically restrained in any way during the interview.  Lawrence said McPhillips talked to him in a "'pretty authoritarian tone of voice,'" making him feel as if he had no choice but to go with the officer and could not walk

7

1  away. Id. at 11.

2      The California Court of Appeal accepted the trial court's factual findings in reviewing that

3  court's ruling. (This court also will do so. See 28 U.S.C. § 2254(e)(1).)  The appellate court

4  identified various factors to consider under state law to determine whether there was a custodial

5  interrogation, noting that no single factor was dispositive; instead, the court was to "'look at the

6  interplay and combined effect of all the circumstances to determine whether on balance they

7  created a coercive atmosphere such that a reasonable person would have experienced a restraint

8  tantamount to an arrest.'" Cal. Ct. App. Opinion, p. 13 (citation omitted).

> Applying the factors here, we agree with the trial court that there was no custodial interrogation.  Appellant and McPhillips left the coffee shop and walked into an open area, albeit away from the public.  McPhillips did not handcuff appellant, or restrain him in any other way.  Furthermore, McPhillips asked open-ended questions that were not aggressive, confrontational, or accusatory.  McPhillips did not mention to appellant that he knew he was on probation and was required to register as a sex offender until after appellant answered questions about the aquarium incident.  The interview was of limited duration, lasting less than 10 minutes and appellant was not arrested at the end of the interview.  Appellant was told that he was free to go.

14  Cal. Ct. App. Opinion, p. 13.  After determining that the motion to suppress was properly denied

15  because there was no Miranda violation, the state court of appeal also rejected the argument that

16  the evidence should have been excluded under California Evidence Code § 352.

17      In Miranda, the Supreme Court held that certain warnings must be given before a

18  suspect's statement made during custodial interrogation can be admitted in evidence.  See 384

19  U.S. at 444 (subject must be advised that he has the right to remain silent, that statements made

20  can be used against him, that he has the right to counsel, and that he has the right to have counsel

21  appointed).  Miranda protections are required "'only where there has been such a restriction on

22  a person's freedom as to render him 'in custody.'"  Stansbury v. California, 511 U.S. 318, 322

23  (1994) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "[I]n custody" means "'formal

24  arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

25  California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. at

26  495).  It requires that "a reasonable person have felt he or she was not at liberty to terminate the

27  interrogation and leave," given the totality of the circumstances.  Thompson v. Keohane, 516

28  U.S. 99, 112 (1995). The Ninth Circuit has identified several factors relevant to the "in custody"

1    determination:

2    > Pertinent areas of inquiry include [1] the language used by the officer to summon the
     individual, [2] the extent to which he or she is confronted with evidence of guilt, [3] the
3    > physical surroundings of the interrogation, [4] the duration of the detention and [5] the
     degree of pressure applied to detain the individual.  Based upon a review of all the
4    > pertinent facts, the court must determine whether a reasonable innocent person in such
     circumstances would conclude that after brief questioning he or she would not be free to
5    > leave.

6    United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981); see, e.g., United States v. Kim, 292

7    F.3d 969, 977-78 (9th Cir. 2002) (defendant was "in custody" where she arrived at her store to

8    look for her son and did not know police were there, the store was surrounded, the police locked

9    the door behind her and left her husband outside, they restricted her communication with her

10   son, they restricted what language she should speak, they restricted when and where she could

11   sit, and the questioning was lengthy and detailed in nature).  Even if a Miranda violation is

12   found, habeas relief should be granted only if the admission of statements obtained in violation

13   of Miranda "'had a substantial and injurious effect or influence in determining the jury's verdict.'"

14   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

15       The Supreme Court has made clear that neither Miranda nor its Supreme Court progeny

16   set down any bright line rule or specific test for determining when someone is in custody and

17   instead suggested the totality of the circumstances of each case must be examined to determine

18   whether there was custody.  See Yarborough v. Alvarado, 541 U.S. 652, 661-62 (2004).  The

19   generality of the Supreme Court's cases involving custodial interrogation means that, for

20   purposes of a federal habeas court deciding whether the state court's decision was an

21   unreasonable application of clearly established federal law, the state court has more leeway in

22   determining whether there was a custodial interrogation.  See id. at 663-64.

23       Here, the California Court of Appeal's determination that there was not a custodial

24   interrogation and therefore no Miranda violation was not an unreasonable application of, or

25   contrary to, clearly established federal law as set out by the Supreme Court.  Like the state court,

26   this court does not see the situation as having been one of custodial interrogation.  Although

27   Lawrence was instructed to go to, and was questioned in, an alley or breezeway away from the

28   public, that area was a public place rather than a police station or somewhere over which the

9

police had exclusive control.  Also, Lawrence was never physically restrained or handcuffed and was never told that he was under arrest.  The incident lasted no more than 10 minutes, and the officer did not question Lawrence in a confrontational, aggressive or accusatory way.  A reasonable person in Lawrence's shoes would have not have felt he was not at liberty to terminate the interrogation and leave.  The fact that officer McPhillips knew of Lawrence's criminal history and sex offender status does not change the result because it is speculative what effect it would have on the questioned person – experience cuts both ways.  See Yarborough v. Alvarado, 521 U.S. at 668.  "True, suspects with prior law enforcement experience may understand police procedures and reasonably feel free to leave unless told otherwise.  On the other hand, they may view past as prologue and expect another in a string of arrests.  We do not ask police officers to consider these contingent psychological factors when deciding when suspects should be advised of their Miranda rights." Id.  There was not a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  Under the totality of the circumstances, the state court reasonably determined that the absence of custody meant that Lawrence did not have to be advised of his Miranda rights by officer McPhillips before being questioned.  Lawrence is not entitled to the writ on this claim.

B.    Admission of Preponderance/Prejudicial Testimony About Prior Bad Acts

Lawrence next challenges the admission of evidence of his prior sexual misconduct involving Danielle and Esmeralda under California Evidence Code § 1108.  He contended in state court that the evidence should have been excluded under California Evidence Code § 352 because the probative value did not outweigh the prejudicial effect.   He argues[2] that the prior misconduct incidents were too remote in time, having occurred at least six years before the current incidents.  He also argues that the incidents were not similar to the charged offenses in that the incident involving Esmeralda did not involve him touching or exposing himself and that

---

[2]The extreme lack of detail in Lawrence's federal habeas petition has required respondent and the court to look to Lawrence's state appellate briefs to learn the substance of his arguments to support the one-sentence claim descriptions in his federal habeas petition.

the incident involving Jessica occurred in a private area rather than in the midst of a busy store. Resp. Exh. C, p. 32.  He further argues that the jury never learned whether he was convicted for the Esmeralda incident and therefore may have wished to punish him for that uncharged offense. Id. at 33-34.  He further argues that the evidence was unduly prejudicial in that it portrayed him as a child molester/pedophile and increased the likelihood of confusing the issues.  Lawrence did not lodge a direct attack on California Evidence Code § 1101 or § 1108, which are the statutory provisions that permitted the evidence.  The court understood Lawrence to be asserting a due process claim.

Prior bad acts in sex offense cases come in through the interplay of three California Evidence Code sections.  Section 1101 provides, in relevant part: "(a) Except as provided in this section and Section[] . . . 1108, . . . evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1108(a), states, in relevant part, that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."   Section 352 permits the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of under prejudice, of confusing the issues, or of misleading the jury."

A state's criminal law (such as an evidence law pertaining to criminal trials) does not violate the Fourteenth Amendment's Due Process Clause "'unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (citation omitted).  "It is not the State which bears the burden of demonstrating that its rule is deeply rooted, but rather respondent who must show that the principle of procedure violated by the rule (and allegedly required by due process) is so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. at 47 (citation and internal quotations omitted; emphasis in original) (rule that intoxication may be considered on the question of intent was not so deeply rooted as to be a fundamental principle

enshrined by the Fourteenth Amendment).  But simply finding a historical basis for or against a rule is not enough:  "The Constitution does not encompass all traditional legal rules and customs, no matter how longstanding and widespread such practices may be.  The Supreme Court has cautioned against the wholesale importation of common law and evidentiary rules into the Due Process Clause of [the] Constitution."  <u>United States v. LeMay</u>, 260 F.3d 1018, 1024-25 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1166 (2002).

The Ninth Circuit has not yet directly ruled on the constitutionality of California Evidence Code § 1108.  However, § 1108 is analogous to Federal Rule of Evidence 414, which governs the admissibility of evidence of prior conduct in cases of child molestation in federal court.  The Ninth Circuit has rejected due process and equal protection challenges to Rule 414, and its reasoning guides this court's consideration of the very similar California law.  <u>See LeMay</u>, 260 F.3d at 1024, 1030.  Rule 414 states that "evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."  Rule 414 does not violate due process because Rule 403 (the federal analog to California Evidence Code § 352) functions as a filter, resulting in the exclusion of evidence that is so prejudicial as to deprive the defendant of his right to a fair trial.  <u>Id.</u> at 1026-27.

California Evidence Code § 1108 functions in a similar fashion to Federal Rule of Evidence 414.  Section 1108 allows for the introduction of evidence of prior sex offenses by a defendant accused of a sex offense and is subject to § 352 which excludes unduly prejudicial evidence.  Like Rule 414, § 1108 does not pose a due process concern because the § 352 filter (the state analog to the Rule  403 filter) does not allow the admission of § 1108 evidence which is so prejudicial as to preclude the right to fair trial guaranteed by the Due Process Clause.

Section 1108 did not violate due process as it was applied in Lawrence's case to admit the evidence under § 352. The state court of appeal concluded that the probative value of the evidence of Lawrence's uncharged acts outweighed its prejudicial effect and that the trial court therefore did not abuse its discretion in admitting the evidence.  Cal. Ct. App. Opinion, p. 20. The state appellate court explained that the evidence was probative in that it tended to prove that

1   Lawrence had a propensity for sexual misconduct against young girls and to prove that Lawrence

2   had a sexual intent when committing the charged acts.  The state court did not see the 6-8 year

3   lapse in time between those incidents and the charged offenses to make them too remote in time.

4   On the prejudice side, the jury had not learned that Lawrence suffered a conviction based on any

5   of the uncharged acts, even though it learned that he had a conviction for annoying or molesting

6   a child and another conviction for indecent exposure.  The court saw the potential for prejudice

7   decreased because the uncharged incidents were "'no stronger and no more inflammatory than

8   the testimony concerning the charged offenses.'" Id. at 20.

9       The crimes with which Lawrence was charged required that there be a sexual intent to his

10   acts, and that made the prior acts especially probative.  To be guilty of the indecent exposure

11   crime, the defendant had to have intentionally exposed his genitals and done so "with the

12   specific intent to direct public attention to his genitals for the purpose of his own sexual arousal

13   or gratification, or that of another, or of sexually insulting or offending others." CALJIC 10.38;

14   CT 332.  Similarly, to be guilty of annoying or molesting a child, the defendant had to engage

15   in conduct directed at a minor "which would unhesitatingly disturb or irritate a normal person

16   if directed at that person" and his conduct had to be "motivated by an unnatural or abnormal

17   sexual interest in the alleged child victim." CALJIC 10.57; CT 336.  Also, the existence of other

18   sexually-motivated misconduct was relevant to disprove the defense that Lawrence was just

19   scratching an itch.  Because the jury could draw from the evidence the permissible inferences

20   that he had the propensity to commit sex offenses against girls and was acting with a sexual

21   intent when committing the charged acts, the admission of the prior bad acts evidence did not

22   violate Lawrence's right to due process.  See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th

23   Cir. 1991).

24       There is not much in the way of clearly established law on the propensity evidence

25   question.  "[T]he Supreme Court has never expressly held that it violates due process to admit

26   other crimes evidence for the purpose of showing conduct in conformity therewith, or that it

27   violates due process to admit other crimes evidence for other purposes without an instruction

28   limiting the jury's consideration of the evidence to such purposes.  Indeed, the Supreme Court

has expressly declined to answer these questions, see Estelle [v. McGuire, 502 U.S. 62, 75 n.5 (1991)] ('Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of "prior crimes" evidence to show propensity to commit a charged crime')." Garceau v. Woodford, 275 F.3d 769, 774-75 (9th Cir. 2001), reversed on other grounds by 538 U.S. 202 (2003).  The absence of Supreme Court authority is particularly important because it informs the court's view that the federal due process claim is not colorable and therefore may be denied notwithstanding Lawrence's failure to exhaust state court remedies as to it.  See Cassett v. Stewart, 406 F.3d at 623-24.  The AEDPA standard of review in 28 U.S.C. § 2254(d) would present a substantial obstacle for Lawrence to surmount if this case were stalled to permit him an opportunity to exhaust the claim.  In light of the absence of Supreme Court authority precluding the use of prior crimes evidence, plus the Ninth Circuit's approval in LeMay of the analogous federal rule, plus the fact that the state court weighed the evidence under § 352, plus the fact that there was a permissible inference to be drawn from the evidence in Lawrence's case, this court is convinced that not only does the claim fail but it also is not even colorable.  Lawrence is not entitled to the writ on this claim.

C.    State Court's Refusal To Allow Lawrence To Re-Open His Case

Lawrence argues that the state court wrongly refused to allow the defense to reopen and present rebuttal evidence after the jury began deliberations.  He contends that the ruling violated his constitutional rights to present a defense and to due process.

Lawrence wanted to re-open to impeach prosecution witness Barbara Feeney who had testified that he came into the Jo-Ann Fabrics store almost every day and stayed for most of the day for about a month or month and a half before he was arrested.

The sequence of events mattered to the trial court deciding whether to reopen the case.  At the trial, defense witness Dr. Marzouk testified out of order because prosecution witness Feeney was not ready.  On the sixth day of the trial, Feeney testified for the prosecution.  The prosecution called one more witness and then rested its case.  At defense counsel's request, the court took a short recess.  Defense counsel conferred with defendant in the holding cell.  After

14

the recess, the defense rested.  Closing arguments were made.  The prosecutor argued that the fact that Lawrence spent so much time in the fabric store showed that he was a predator.[3] Defense counsel began his closing argument, but stopped for an end-of-day recess at 4:28 p.m. The next day (Tuesday, August 19), defense counsel finished his closing argument, the prosecutor gave his rebuttal, the court instructed the jury, and the jury retired to deliberate.  The jury deliberated from 1:45 p.m. until 4:30 p.m.  Defense counsel went away for two days and work on the case stopped.  The jury was ordered to return on Friday, August 22, to resume deliberations.  The jury requested a read-back of testimony, and defense counsel was present for the read-back on Friday morning.  When defense counsel returned to his office, he found a fax detailing Lawrence's employment history for the six weeks preceding his arrest.  Counsel returned to court and requested to put something on the record.  The court was busy with a jury from another case and did not take up this case until the afternoon.  At 2:00 that day (Friday), defense counsel returned to court and moved to reopen the defense case to introduce Lawrence's work records and to impeach Feeney's testimony by showing that Lawrence could not have been at the store on a daily basis.  Defense counsel said he was unaware that Feeney would testify that Lawrence was a daily visitor to the store because that information was not in the discovery he received and the prosecutor had not told him of it.  Defense counsel said he had tried to subpoena two employees from Lawrence's workplace that day (Friday), but had been unsuccessful because his investigator arrived after the workplace closed.  The witnesses would not be present until Monday.  Defense counsel said his witnesses would testify that Lawrence worked 6:30 a.m. to 3:30 p.m. Monday through Thursday and 6:30 a.m. to 12:30 p.m. on Fridays.  Defense counsel argued that the evidence would not be time-consuming and that the records were important because they went "'to some issue that Ms. Feeney has testified and which the prosecutor argued showed my client is some kind of a predator.'"  Cal. Ct. App.

---

[3]The prosecutor argued: "But there is even more evidence the defendant was specifically engaged in predatory behavior on the 24th, on the 5th, and the 12th. [¶] He spent all day at Joanne's on weekends and weekdays.  All day he would be there.  Barbara Feeney came in and testified he would come in the morning at ten and would leave at six or seven on the weekdays, and the weekends and he would just hang out at the store.  He wasn't buying fabric.  He stayed until closing."  RT 491.

Opinion, p. 22.  The prosecutor said he was unaware that Feeney intended to testify about the frequency of Lawrence's visits to the store and thought it very suspicious that defense counsel raised the employment issue only after deliberations began and not during Feeney's testimony. In response to the court's inquiry why Lawrence had not told defense counsel he had been working at the time defense counsel was cross-examining Feeney, "defense counsel explained that [Lawrence] did pull him by the sleeve and told him that he was at work, but because [defense counsel] was cross-examining Ms. Feeney he 'may not have taken notice of him.' The court asked counsel if he had heard what [Lawrence] had said.  Defense counsel replied that he had not." Cal. Ct. App. Opinion, p. 22.  Defense counsel wasn't certain whether Lawrence actually had pulled his sleeve, but said that occasionally happens and when he doesn't want to be interrupted, he tells the client to wait and continues questioning the witness.  Resp. Exh. B-1, RT 13-14.  The prosecutor told the court that if the defense re-opened, he wanted to recall Feeney to explain any discrepancy and to put on another store employee who would testify Lawrence was coming into the store for 2-3 weeks leading up to his arrest.  The trial court did not believe that Lawrence had tried to tell defense counsel something during Feeney's testimony and noted that Lawrence could have brought the issue of his employment to counsel's attention during recess or during certain in camera hearings.  The trial court denied the defense motion to reopen, finding that there was no due diligence.[4]  The court noted that defense counsel had other records (i.e., bank records and fitness club records showing Lawrence was in Southern California on September 18, October 7 and October 10) incompatible with daily attendance at the store and could have used those to cross-examine Feeney.  Id. at 23-24.

The state court of appeal found that the denial of the motion to reopen was harmless error at most under state law.  Id. at 24.  The state court of appeal also discussed the key U.S. Supreme Court cases on the right to present a defense and determined that there was no federal

---

[4]The factors that the state courts considered in examining the motion to reopen "include[d] the stage the proceedings had reached when the motion was made, the diligence shown by the moving party in discovering the new evidence, the prospect the jury would accord it undue emphasis, and the significance of the evidence." Cal. Ct. App. Opinion, p. 24; see also Resp. Exh. B-1, RT 5-7.

1    constitutional violation.

2           Here, we are convinced that the trial court's ruling in denying appellant's motion to
     reopen was not a denial of due process under the federal Constitution. The central issue
3    in the case was not that appellant was not the person identified by the children in the
     store. Rather, the central issue was what appellant was doing: scratching an itch because
4    his herpes had recurred, or playing with and exposing his private parts for sexual
     purposes.

5
            As noted, the value of the new evidence was that it might have "taken some sting"
6    out of the prosecution's argument that Ms. Feeney's testimony showed that appellant was
     engaged in "predatory behavior." In no way did it prevent appellant from presenting his
7    defense that he was suffering from recurring bouts of herpes on the days when the victims
     saw him touching his private parts.

8
     Cal. Ct. App. Opinion, p. 26.
9
            The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether
10
     rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the
11
     Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution
12
     guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane
13
     v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of
14
     the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory
15
     process for obtaining a favorable witness.
16
            The right to offer the testimony of witnesses, and to compel their attendance, if necessary,
17   is in plain terms the right to present a defense, the right to present the defendant's version
     of the facts as well as the prosecution's to the jury so it may decide where the truth lies.
18   Just as an accused has the right to confront the prosecution's witnesses for the purpose
     of challenging their testimony, he has the right to present his own witnesses to establish
19   a defense. This right is a fundamental element of due process of law.

20   Washington v. Texas, 388 U.S. 14, 19 (1967). This right was held applicable to the states

21   through the Fourteenth Amendment. See id. at 18-19. A cluster of Supreme Court cases have

22   addressed the criminal defendant's right to present evidence in support of his defense. In

23   Chambers v. Mississippi, 410 U.S. 284 (1973), the Court held that the defendant was denied a

24   fair trial when the state's evidentiary rules prevented him from calling witnesses who would have

25   testified that another witness made trustworthy, inculpatory statements on the night of the crime.

26   And in Crane v. Kentucky, 476 U.S. at 690-91, the Court held that the defendant's right to

27   present a defense was violated by a trial court's blanket exclusion of competent, reliable evidence

28   bearing on the credibility of a confession when such evidence is central to the defendant's claim

17

of innocence.  See also Green v. Georgia, 442 U.S. 95 (1979) (finding a due process violation in the exclusion of highly relevant and reliable hearsay evidence on a key issue); Rock v. Arkansas, 483 U.S. 44, 56-62 (1987) (Arkansas' per se rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict defendant's right to testify).  The common thread running through these cases is that "states may not impede a defendant's right to put on a defense by imposing mechanistic (Chambers) or arbitrary (Washington and Rock) rules of evidence."  LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir.), cert. denied, 525 U.S. 971 (1998); see also Carson v. Peters, 42 F.3d 384, 387 (7th Cir. 1994) (Chambers and Green "establish[] the rule that 'if the defendant tenders vital evidence the judge cannot refuse to admit it without giving a better reason than that it is hearsay.' [Citation.]  If the state judge does give a 'better reason,' then Chambers and Green have served their purpose--to relax the stranglehold of maxims and get judges to think functionally.")

The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  Chambers, 410 U.S. at 295; Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  Thus, a defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence; the exclusion of evidence does not violate the Due Process Clause unless it offends some fundamental principle of justice.  Montana v. Egelhoff, 518 U.S. 37, 42-43 (1996).  "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues. . . .'  Moreover, [the Court has] never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability--even if the defendant would prefer to see that evidence admitted."  Crane, 476 U.S. at 689-90 (citations omitted).

The denial of the defense motion to reopen did not violate Lawrence's federal constitutional rights.  The state rule regarding the reopening of evidence is not an irrational rule and provided meaningful and reasonable standards to guide that discretion, see footnote 4, supra.

The rule promotes focused evidentiary presentation and finality; it also avoids the undue consumption of time.   The trial court reasonably concluded that there had been a lack of due diligence in obtaining the new evidence.  The jury had already been deliberating for about a day when the defense moved to reopen (i.e., Tuesday afternoon and Friday until 2:00 p.m.)  There would have been considerable delay in the resolution of the trial because defense counsel wanted to present the evidence the following Monday and the prosecution wanted to present other evidence to rebut that new defense evidence.  The new evidence likely would have required further closing arguments to account for that evidence.  Only then would the jury start over with its deliberations.  There also was evidence that defense counsel had not tried to cross-examine Feeney with the few records he did have available during the trial showing at least three days on which Lawrence could not have been at the store in the weeks preceding his arrest, and had not even tried easy routes to cross-examine Feeney about her ability to recall the daily visits such as whether she worked seven days a week at the store and whether she had duties other than watching him.  The trial court also reasonably believed that if Lawrence wanted to get his attorney's attention to rebut Feeney's statement about the frequency of his visits, he could have and would have done so.[5]   The trial court's determination that there was not due diligence by defense counsel to support the reopening of the evidence was reasonable.

The state court of appeal also reasonably determined that the refusal to reopen the evidence did not actually preclude the chosen defense.  The charge was not that Lawrence lurked in a fabric store, but that he had engaged in crimes against children there.[6]   His repeated visits to the fabric store were simply not an element of his crimes.  And, there was no dispute about identity: Lawrence was identified by Nia while in the store and arrested there on the day of the

---

[5]Lawrence believes that the trial court's opinion that Lawrence could have obtained his attorney's attention was unsupported by the record, as "there's no place in the record where I'm admonished for talking out of turn."  Traverse, p. 13.  He errs: just moments before the judge commented that Lawrence was "vociferous," she admonished him stop talking while his attorney was speaking or he would be ejected.  See Resp. Exh. B-1, RT 16, 18.

[6]Indeed, defense counsel argued that jury would not accord the proposed new evidence undue emphasis because of its nature: "It doesn't go to anything these girls have claimed.  It actually just goes to some issue that Ms. Feeney has testified and which the prosecutor argued showed my client is some kind of a predator."  See Resp. Exh. B-1, RT 7.

most recent offense.  The key question for the jury was what Lawrence was doing when observed by the children.  The new evidence might have "taken some sting" out of the argument that Feeney's testimony showed that Lawrence was engaged in predatory behavior, but there was ample other evidence to support an argument of predatory behavior: there were incidents against four different girls (Carly, Nia, Danielle and Esmeralda), the girls had no relationship to one another, the incidents occurred on different dates and in different places, three of the events had the same scenario of a middle aged man exposing and/or touching his genitals in front of young girls while adults were not in the immediate area.  There was plenty for the prosecutor to use to portray Lawrence as engaging in predatory behavior, even if Feeney's testimony was contradicted by other evidence.

Lastly, Lawrence was not precluded from presenting his herpes defense.  Feeney's testimony had nothing to do with that evidence.

The California Court of Appeal identified and reasonably applied the key right-to-present-a-defense cases from the U.S. Supreme Court, i.e., <u>Crane v. Kentucky</u>, <u>Washington v. Texas</u>, and <u>Chambers v. Mississippi</u>.  The California Court of Appeal's rejection of Lawrence's claim was not contrary to or an unreasonable application of federal law, as determined by the U.S. Supreme Court.  Lawrence is not entitled to the writ on this claim.


D.    <u>Sheriff's Evidence-Gathering and Evidence Preservation</u>

Lawrence claims that his right to due process was violated by the Santa Clara Sheriff's Department's practices of "not recording all the facts."  Petition, p. 7.  He contends that the Sheriff failed to record witnesses in the vicinity, failed to test his fanny pack and pants (apparently for semen), failed to photograph and map the store, and failed to photograph his clothes and body.  He also contends that the Sheriff tainted potential witnesses by parading him in handcuffs before them.  The claims were presented in a habeas petition to the California

1    Supreme Court.  That court denied the claims without discussion.[7]

2         Lawrence's claim fails.  First, he cannot make the basic showing required under 28 U.S.C.

3    § 2254(d)(1) for federal habeas relief.  Under § 2254(d)(1), habeas relief is available only if the

4    state court's adjudication of the claim "resulted in a decision that was contrary to, or involved

5    an unreasonable application of, clearly established Federal law, as determined by the Supreme

6    Court of the United States."  There is no clearly established federal law as determined by the

7    U.S. Supreme Court that due process requires the government to collect exculpatory evidence.

8    Although the government does have a duty to preserve material evidence, that duty is limited to

9    evidence it has gathered.  See California v. Trombetta, 467 U.S. 479, 489 (1984); see also Miller

10   v. Vasquez, 868 F.2d 1116, 1119-20 (9th Cir. 1999).  In fact, the Supreme Court hinted that there

11   is no duty to perform any particular test when it strongly disagreed with the notion that the Due

12   Process Clause was violated when the police fail to use a particular investigatory tool in Arizona

13   v. Youngblood, 488 U.S. 51, 58-59 (1988).  See id. at 59 ("The situation here is no different than

14   a prosecution for drunken driving that rests on police observation alone; the defendant is free to

15   argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police

16   do not have a constitutional duty to perform any particular tests").  Without the required clearly

17   established federal law, the state court's rejection of Lawrence's claim cannot be contrary to or

18   an unreasonable application of such law.

19        Second, even if one could stretch Trombetta to stand for the proposition that there is a

20   duty to collect evidence as well as to preserve already-collected evidence, Lawrence's claim

21   falters because he has not shown any bad faith by the government.  Unless a criminal defendant

22   can show bad faith on the part of the police, he cannot establish a due process violation based

23   on the police's failure to preserve evidence that is potentially useful.  See Arizona v.

24   Youngblood, 488 U.S. at 58; Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997), cert.

25

26        [7]When confronted with such an unexplained decision, this court conducts an independent
27   review of the record to determine whether the state court's decision was an unreasonable
     application of clearly established federal law.  See Plascencia v. Alameda, 467 F.3d 1190, 1197-
28   98 (9th Cir. 2006).

denied, 522 U.S. 1079 (1998).  Negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process.  If bad faith is required to prove a failure-to-preserve-evidence claim, it likewise would be required to prove a failure-to-collect-evidence claim.

Third, the part of the claim that asserts that Lawrence was paraded before potential witnesses in handcuffs fails for lack of evidentiary support and because the event (if it occurred) would have been legally irrelevant.  Surely, the victim and her mother weren't influenced by seeing Lawrence in handcuffs, as they had just accused him of the criminal activity and called the police.  Lawrence has not identified anyone who was influenced by seeing him in handcuffs and has not shown that the "parade" consisted of anything other than him being arrested and removed from the premises in handcuffs.  This was not a case where identity was in dispute, so there is not a likelihood of an impermissibly suggestive identification.  Cf. Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process.")

Lawrence is not entitled to the writ on this claim because he has not shown that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d) and because he has not shown the required bad faith conduct by the government in not collecting the evidence and conducting the tests.

E.    Prosecutorial Misconduct

In this claim, Lawrence contends that the prosecutor engaged in misconduct by "position[ing] mugshots on his bench while jurors entered the jury box having to travel directly by the photos and prejudicing jurors."  Petition, p. 7.  This claim was presented to the California Supreme Court in Lawrence's petition for writ of habeas corpus and was denied without discussion.

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory

power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's acts render a trial fundamentally unfair. Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")

Assuming arguendo that Lawrence could prove that the prosecutor had displayed mugshots of Lawrence on his table and one or more jurors saw the photos, such an action would not have rendered the trial fundamentally unfair. Lawrence had stipulated that he suffered a misdemeanor conviction for annoying or molesting a child in 1996 and a misdemeanor conviction in 1995 for indecent exposure. Given those convictions and his current prosecution, the jurors would know that he had been arrested at least two or three times. It would come as no surprise to the jurors that mugshots had been taken of him on each of those arrests. The alleged display of mugshots were not mentioned or addressed at trial, so no curative instruction was given, but the general jury instructions told the jurors that they had to decide guilt or innocence only on the evidence before them and could not be influenced by any passion, prejudice, or public opinion. See RT 551-552. The California Supreme Court's rejection of the prosecutorial misconduct claim was not contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court. Lawrence is not entitled to the writ on this claim.

F.    Ineffective Assistance Of Counsel

The Sixth Amendment right to counsel guarantees effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. A habeas petitioner must establish two things to prevail on a Sixth Amendment ineffectiveness claim: (1) that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, Id. at 687-688; and (2) that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

23

1   unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A

2   difference of opinion as to trial tactics does not automatically amount to ineffective assistance.

3   See Brodit v. Cambra, 350 F.3d 985, 994 (9th Cir. 2003), cert. denied, 542 U.S. 925 (2004).

4          Lawrence complains of numerous ways in which his attorney provided ineffective

5   assistance of counsel, but his recurring theme is that the defense counsel pursued a bad defense

6   strategy.  Lawrence argues that defense counsel should have put on a fanny pack defense instead

7   of a defense that Lawrence was scratching an itch related to herpes.  Lawrence reports that he

8   "has always claimed to have been placing his thumb in the fanny pack belt, and with his fingers

9   been dangling touching his fanny pack under his tee shirt."  Traverse, p. 7.  He urges that he

10  should have been allowed to testify and "would not have had impeachment issues."  Petitioner's

11  Request For A Ruling, p. 2 (Docket # 33.)

12         The sheer number of incidents of sexual improprieties around children presented a huge

13  problem for Lawrence that he simply ignores but defense counsel rightly did not.  Defense

14  counsel chose a reasonable strategy in light of the reports of the incidents involving Nia, Carly,

15  Caroline, Danielle, and Esmeralda, as well as Lawrence's criminal record that included repeated

16  arrests for lewd and lascivious conduct with minors and indecent exposure crimes.  See CT 404-

17  411.  Defense counsel's chosen strategy was consistent with the reported fact that Lawrence did

18  have herpes.  The herpes defense did not risk antagonizing the jury by calling the several child

19  witnesses liars and instead was a way to put a non-sexual spin on Lawrence's conduct that the

20  children had observed.   Lawrence's proposed fanny pack defense was weak in that it didn't

21  provide any answer to the different children's reports about the movement of Lawrence's hands

22  near his genitalia as well as Nia's specific statement that she saw him holding his penis.

23  Lawrence's proposed fanny pack defense would have begged the question of how could so many

24  different girls have been wrong about what he was doing with his hands, while the herpes

25  defense gave a plausible (if not successful) non-sexual reason why the different girls on different

26  occasions had seen Lawrence touching himself.  Defense counsel did not engage in deficient

27  performance in pursuing the herpes defense instead of the fanny pack defense and it can be said

28  with certainty that there is not a reasonable probability that, if counsel had pursued the fanny

1   pack defense, the result of the proceeding would have been different.  The court now turns to

2   Lawrence's particular complaints.

3       First, Lawrence claims that his attorney made statements in his closing argument that the

4   defense did not have to prove anything.  Defense counsel argued that the defendant "doesn't have

5   to prove anything.  Doesn't have to come in here, with all the resources that's available to the

6   State, and prove anything."  RT 496.  This was not deficient performance.  It was a correct

7   statement of the law and a common method for defense counsel to argue  how the burden of

8   proof falls on the prosecution.  "[C]ounsel has wide latitude in deciding how best to represent

9   a client, and deference to counsel's tactical decisions in his closing presentation is particularly

10  important because of the broad range of legitimate defense strategy at that stage."  Yarborough,

11  540 U.S. at 5-6.  See Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (counsel's exclusion of some

12  issues in closing did not amount to professional error of constitutional magnitude where issues

13  omitted were not so clearly more persuasive than those raised); United States v. Fredman, 390

14  F.3d 1153, 1157-58 (9th Cir. 2004) (affirming validity of "confession and avoidance" tactic by

15  counsel to avoid diminishing his credibility by arguing a lost cause on part of the case).

16      Second, Lawrence argues that trial counsel "presented no evidence to indicate innocence

17  or even raise a question of doubt."  Petition, p. 8.  Lawrence is wrong on the facts: defense

18  counsel presented evidence that Lawrence suffered from genital herpes and that herpes caused

19  itchiness before an actual outbreak.  Counsel argued from this evidence that Lawrence was

20  scratching that itch in the fabric store and not engaging in sexual misconduct.  There was not

21  deficient performance in the presentation of the defense.

22      Third, Lawrence claims that his attorney did not pursue evidence that would have shown

23  he could not have been in the store on September 24, 2002 (i.e., the day of the offense against

24  Carly).  Lawrence fails to show deficient performance or resulting prejudice on this point.  The

25  evidence he claims should have been pursued would have not have provided a complete alibi.

26  There allegedly were records that would have shown he went to work for 8.5 hours, put a deposit

27  down for a wet suit and entered his gym at a specific time, but these records would not have

28  ruled out the possibility that he also had been in the fabric store on the same day.  Also, the

evidence was irrelevant to the scratching-an-itch defense that counsel had chosen to pursue. Defense counsel had specifically chosen not to present an alibi defense. <u>See</u> Resp. Exh. B-1, RT 21 (defense counsel states that "we have never and will not and do not suggest an alibi in this case").  Deference is owed to the reasonable and considered choice of strategy.

Fourth, Lawrence complains that counsel should have obtained the work records that became the subject of the previously-discussed motion to reopen much earlier than he did.  The failure to timely obtain the records did not prejudice Lawrence.  As discussed in section C above, the store clerk's testimony was not central to the case, as it was not necessary to show that Lawrence lurked in the store daily for a month or month and a half.  Lawrence was indisputably in the store when he was arrested on October 12 for the offense against Nia and there were enough separate instances of sexual misconduct in front of young girls that the prosecutor could have argued the point based on that evidence even if the store clerk's testimony was undermined.

Fifth, Lawrence complains that defense counsel did not challenge the fact that he was paraded in front of potential witnesses on the day of his arrest.  This claim fails on both the deficient performance and prejudice prongs of <u>Strickland</u>.  Lawrence has not shown anything more than that he was handcuffed incident to his arrest and removed from the premises. Lawrence has not shown what legal challenge might have been lodged that would have been successful.

Sixth, Lawrence apparently contends counsel did not find potentially exculpatory witnesses at the fabric store.  It is not clear how counsel could have found the witnesses in light of the Sheriff's alleged failure to document them but even if other shoppers could be found, Lawrence doesn't show how they would have helped.  The fact that other shoppers did not see him touching himself would not have proved much, as sex crimes against children tend to be secretive by nature.  Indeed, showing that other shoppers had not seen Lawrence touching himself could have strengthened the prosecution's case in that it would show that Lawrence wasn't an indiscriminate exhibitionist, but specifically wanted to touch himself in front of young girls.  Conversely, if other shoppers had seen Lawrence exposing himself, more charges could have been filed against him.  Additionally, what other shoppers saw or did not see was not

necessarily relevant to the chosen defense strategy that Lawrence was scratching an itch. Counsel's failure to search for potentially exculpatory witnesses was not deficient performance and there is no showing of prejudice to Lawrence's case in light of the strong evidence against him.

Seventh, Lawrence complains that defense counsel did not obtain his clothing from the day of his arrest. As respondent notes, the presumed purpose for obtaining the clothing would have been to test it for semen. Counsel's failure to do so did not result in a constitutional violation. The prosecution did not need or attempt to prove that in the course of the charged incident that Lawrence ejaculated. While the presence of semen in Lawrence's pants might have strengthened the prosecution's case, the absence of it did not weaken the prosecution's case or have exculpatory value.

Eighth, Lawrence complains that defense counsel insisted he not testify. A defendant has a fundamental right to testify in his own behalf, see Rock v. Arkansas, 483 U.S. 44, 51-53 (1987), but counsel's strong urging that Lawrence not testify did not preclude the exercise of that right. One cannot be certain exactly what Lawrence's testimony would have been because he did not testify. However, it is clear that the good would have come in with the bad, and there was substantial unfavorable material that would have been introduced if Lawrence testified. As noted earlier, the sheer number of separate incidents of sexual misconduct in front of minors provided fertile ground for impeachment and cross-examination by the prosecutor. The record discloses a significant reason for counsel's tactical decision to strongly urge his client to not testify, i.e., Lawrence's testimony would undermine the main defense theory.[8] Because the

_____

[8]The record shows that counsel had made a considered choice to pursue the herpes defense. Before trial started, he had obtained medical records and made a motion in limine regarding the herpes evidence. See CT 218. He also retained an expert doctor to testify about the itchiness associated with herpes. It would not have aided the defense to have the defendant go in a different direction and testify that he had his hand on his fanny pack and wasn't scratching any itch. Indeed, that apparently was just what defense counsel told his client. See Traverse, p. 10 (during recess after prosecution rested, "Mr. Burland instructs me that I can not testify for me to tell my only testimony would in his words damage the credibility of the established, testimony of the doctor"). Defense counsel's several steps to obtain and present the evidence undermines Lawrence's suggestion that defense counsel sprung the herpes defense on him unexpectedly at trial. His suggestion also is undermined by the fact that he complained before trial began that defense counsel had not explained to him if he had subpoenaed an expert

1   decision was reasonable and counsel did not explicitly prohibit his client from testifying in his

2   own behalf, the ineffective assistance of counsel claim fails.

3        Ninth, Lawrence claims that counsel failed to present testimony from a witness who saw

4   a tattoo on his lower abdomen.  This claim fails because Lawrence fails to explain the probative

5   value and significance of any temporary tattoo.  There also is no showing of prejudice resulting

6   from the alleged failure to present evidence that Lawrence had a temporary tattoo.

7        Tenth, Lawrence claims that defense counsel improperly failed to object to the

8   prosecutor's display of mugshots on his table.  Lawrence has not provided evidence that counsel

9   was aware of the display.  And he has not shown any prejudice from the failure to object, even

10  if he could show that defense counsel saw the prosecutor display the mugshots.  As discussed

11  in section E above, the jury knew Lawrence had been arrested at least twice, so the fact that there

12  were mugshots of him would not be surprising or inflammatory to the jury.

13       Eleventh, Lawrence claims counsel failed to prepare and present charts, maps and photos

14  of the inside of the fabric store.  This claim fails for a lack of a showing of deficient performance

15  and prejudice.  The evidence was irrelevant to the scratching an itch defense.

16       Twelfth, Lawrence claims that counsel wrongly failed to cross-examine Carly regarding

17  her statements that she encountered Lawrence in an aisle of the store that had Halloween toys.

18  He urges that evidence should have been introduced that a fabrics store like Jo-Ann's does not

19  sell toys.  This claim fails for a lack of deficient performance or prejudice.  The impeachment

20  of the witness was not necessary for or helpful to the scratching an itch defense.  Counsel could

21  reasonably feel that cross-examining the child witness on the point of whether the store had toys

22  for sale would not advance his client's interest.  Further, as respondent argues, it strains credulity

23

24  witness, see Resp. Exh. H, claim 8, p. 2, which begs the question of why there would have been
    any expert witness needed but for the presentation of herpes evidence.

25

26       Lawrence's traverse suggests that defense counsel also may have thought Lawrence's
    attitude would not go over well with the jury, as he states that when they met at the county jail
27  and discussed his desire to testify,  "Mr. Burland proceeded to ask about an un-charged event,
    and my only response was to ask back why they had not prosecuted.  Mr. Burland then stopped
28  all rehearsal and left."  Traverse, p. 11.

to believe that, a few weeks before Halloween, a fabrics store like Jo-Ann's would not have items that a 9-year old could view as being toys.

Having independently reviewed the record, this court concludes that the California Supreme Court's rejection of Lawrence's various claims that his counsel provided ineffective assistance of counsel was not contrary to or an unreasonable application of <u>Strickland v. Washington</u>. Lawrence is not entitled to the writ on this claim.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. Petitioner's motion for a ruling is GRANTED to the extent petitioner wanted a ruling on his petition and denied in all other respects. (Docket #33.) This order is the court's ruling on his petition. The clerk shall close the file.

IT IS SO ORDERED.

DATED: February 22, 2007

_____
SUSAN ILLSTON
United States District Judge